IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

| | |
|---|---|
| DALE FARMER; CALDERA GROUP, LLC,<br><br>      Plaintiffs and Counterclaim Defendants,<br><br>      v.<br><br>THAR PROCESS, INC.,<br><br>      Defendant and Counterclaimant,<br><br>      v.<br><br>PACIFIC WEST MANUFACTURING, LLC,<br><br>      Counterclaim Defendant. | Civ. No. 1:22-cv-01076-AA<br><br>**OPINION & ORDER** |

AIKEN, District Judge.

On November 21, 2023, this Court entered an order of default against Defendant Thar Process, Inc. ("Thar") in which Thar was defaulted as to all claims against it and all of Thar's counterclaims were dismissed. ECF No. 41. This case now comes before the Court on Plaintiffs' Motion for Default Judgment. ECF No. 42. The Court held an evidentiary hearing on the issue of damages on December 5, 2023

at which Plaintiff Dale Farmer testified on behalf of Plaintiffs. For the reasons set forth below, the motion is GRANTED as to all claims except Plaintiffs' claim for unjust enrichment and DENIED as to Plaintiffs' claim for unjust enrichment. Final judgment shall be entered accordingly.

## LEGAL STANDARD

For purposes of default judgment, all well-pleaded allegations in the complaint, except those relating to damages are assumed to be true. *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977). "The district court's decision whether to enter a default judgment is a discretionary one." *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).

In exercising this discretion, courts consider the factors discussed in *Eitel v. McCool*, 782 F.2d 1470 (9th Cir. 1986). The *Eitel* factors are (1) the possibility of prejudice to the plaintiff; (2) the merits of the plaintiff's substantive claims; (3) the sufficiency of the operative complaint; (4) the sum of money at stake in the litigation; (5) the possibility of dispute over material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy favoring decision on the merits. *Eitel*, 782 F.2d at 1471-72. The court's analysis begins with "the general rule that default judgments are ordinarily disfavored," and cases should be decided upon their merits whenever reasonably possible *Id.* at 1472 (citation omitted).

## BACKGROUND

Plaintiffs sought to purchase a supercritical fluid extractor ("Extractor") from Thar to extract cannabinoids from hemp plants. Farmer Decl. ¶ 3. ECF No. 42. On

June 22, 2018, Plaintiffs and Thar entered into a purchase agreement ("Agreement") describing in detail the design and quality specification of the Extractor to be manufactured and delivered by Thar to Plaintiffs. *Id.* at ¶ 4; Farmer Decl. Ex. 1. ECF No. 28-2. In the Agreement, Thar warranted the proper mechanical performance of the Extractor and guaranteed that it would be free from material defects in workmanship for a period of eighteen months after start-up or two years after shipment. Farmer Decl. ¶ 5; Ex. 1, at 4. The total contract price was $2,413,000. Farmer Decl. ¶ 7. Plaintiffs paid half the purchase price before the Extractor was shipped from Thar's facilities in Pennsylvania. *Id.* at ¶ 9.

Thar was to deliver the Extractor by August 2018 to allow Plaintiff Caldera to fill pending orders. Farmer Decl. ¶ 35. Thar was aware of the pending orders and the need for timely delivery. *Id.* Thar failed to meet the delivery date and, in breach of the Agreement, shipped the Extractor to Plaintiffs in Oregon before any representative of Plaintiffs could confirm that the Extractor was in working order. *Id.* at ¶ 10; Ex. 1, at 11. Plaintiffs later learned that the Extractor had not been functional at any time prior to being shipped from Pennsylvania, which is why Thar forwent inspection prior to shipping. Farmer Decl. ¶ 40. The Extractor was not ultimately delivered to Plaintiffs until March 2019 and Plaintiffs were unable to fulfill customer orders from 2018 through early 2019. *Id.* at ¶¶ 37-38.

Contrary to the specifications of the Agreement, Thar sourced the Extractor's components from refurbished and mismatched equipment, which Thar employees referred to as a "Frankenstein." Farmer Decl. ¶ 11. Contrary to the Agreement, the

Extractor was made of galvanized steel, rather than the contracted-for stainless steel. *Id.* ¶ 41. Thar again breached the Agreement by failing to provide competent supervision for the installation and start-up of the Extractor at Plaintiff's facility in Oregon. Farmer Decl. ¶¶ 12, 43; Ex. 1, at 12. The documents and blueprints provided by Thar were materially inaccurate, causing additional delays. Farmer Decl. ¶ 12. When Thar representatives did eventually arrive at Plaintiff's facility, "it became abundantly clear" that the representatives were not qualified and, even with guidance from Thar headquarters, the representatives "incorrectly wired the Extractor on several occasions." *Id.* at ¶¶ 45-46.

The "Frankenstein" Extractor eventually arrived at Plaintiff's facility in Oregon in March 2019 and Plaintiffs "immediately began experiencing significant issues with both the Extractor's capability and reliability, necessitating constant repair and resulting in major delays in their ability to get their product to market. Farmer Decl. ¶ 13. "Thar's refusal and/or inability to adequately supervise the installation and start-up of the Extractor—which, again, it was contractually bound to do—created legitimate safety risks to the Caldera team, resulted in significant delays, caused facility damage (including gas releases, high-voltage electrical exposure, and fire-risk exposure) and necessitated expensive equipment rentals in order to move and position the Extractor." *Id.* at ¶ 46.

Plaintiffs found that, after Thar's "haphazard and improper installation and set-up," the Extractor "failed to meet even the most basic standards of workmanlike conditions, let alone the specifications required under the Agreement." Farmer Decl.

¶ 47. Thar had failed to provide a 40kg/m pump, as agreed upon, and had shipped the Extractor with only a "well-worn, used 20kg/m pump," which Thar attempted to rectify by adding a second 20kg/m pump, "fundamentally altering the specification that the Parties had agreed upon." *Id.* at ¶ 49. This alteration also required Thar to bypass the Extractor's safety measures and alarms, unbeknownst to Plaintiffs, with the result that the Extractor ran both inefficiently and unsafely. *Id.* at ¶ 50. "In the initial eight months following the Extractor's delivery and installation, it failed to run at the 40kg/min flow rate that the Plaintiffs had contracted for, and more often than not, it failed to run at all." *Id.* at ¶ 48.

The Extractor's computer control system would randomly shut down the pumps, which Thar representatives attempted to remedy by "mashing the Extractor's on and off buttons until the pumps restarted." Farmer Decl. ¶ 51. The Extractor's poor construction also resulted in "significant and alarming quantities of crude oil" to be found in the Extractor's pumps, "endangering anyone handling the Extractor." *Id.* at ¶ 52. Additionally, the Extractor "did not incorporate an in-line wax mitigation device as agreed upon, drastically increasing Plaintiff's costs as they were required to spend more than $100,000 to purchase equipment to manually remove wax from the final product on the back end, a challenging and time-consuming task." *Id.* ¶ 53.

Plaintiffs also discovered during an inspection of the Extractor's preheater and associated temperature control valve that there were improperly installed utility headers, and "it was eventually discovered that Thar installed several key components of the machine <u>backwards</u>, causing many of the issues the Plaintiff

experienced in getting the machine to function." Farmer Decl. ¶ 54 (emphasis in original).

Consequently, Plaintiffs refused to sign off on the Extractor and refused to pay the balance of the purchase price unless Thar cured the breaches of the Agreement. Farmer Decl. ¶¶ 14, 63, 64. Thar never cured the breaches and "the Extractor, which currently sits idle, has never functioned as contracted." *Id.* ¶¶ 15, 62.

In mid-2019, Plaintiffs contracted with a third-party to diagnose and repair the Extractor. Farmer Decl. ¶ 55. In that inspection, the third-party company found:

> [T]hat the skid alignment and installation left piping union alignment vulnerable to pressure leaks; mismatched materials disqualified the Extractor from cGMP certification and left the machine vulnerable to excessive corrosion, leakage, and safety issues; the carbon dioxide pumps were not wired to meet code standards; valves and unions needed frequent post installation adjustment to combat rampant leakage; Thar had used well-worn used parts in the construction of the Extractor in place of new parts; and poor craftsmanship with regard to the Extractor's welding created internal surface and flow characteristics that left it vulnerable to bacterial contamination.
>
> Thar's installation and fabrication of the Extractor was so grossly inadequate that faulty wiring on the Extractor's motors (which operate on three-phase, 480-volt power at 15 amps) were left ungrounded, putting the lives of the Caldera team at serious risk of death by electrocution each time they handled the Extractor. The piping sourced by Thar did not meet size and diameter requirements, nor was it rated and certified for the Extractor's required pressures and twice put the Caldera team's lives at risk after pipe ruptures resulted in flooding of Caldera's facility with carbon dioxide.

Farmer Decl. ¶¶ 56-57.

After "significant time and expense," Plaintiffs were able to get the Extractor to run at the specified rate, but "new problems began to manifest." Farmer Decl. ¶ 59. "To date, Plaintiffs have been unable to extract CBD at an acceptable and

consistent concentrate rate resulting in a significant amount of customer biomass being wasted and incurring material costs," and "running certain biomass feedstock cultivars (those tailored for CBG) through the machine would result in biomass being totally destroyed thus further exacerbating Plaintiffs' attempt to get to market." *Id.* at ¶ 60.

In August 2020, Plaintiffs sought another third-party assessment of the Extractor, which found numerous issues, "including no less than nine code violations," and recommended that the Extractor's panels be re-designed and re-wired in accordance with electrical compliance standards. Farmer Decl. ¶ 61. "As a direct result of Thar's numerous breaches, Caldera was forced to cancel customer orders made earlier in 2018 in reliance on the scheduled operational date of the Extractor, preventing [Caldera] from participating in what was at the time a thriving industry with high profit margins, and harming its reputation in the process." Farmer Decl. ¶ 16. Plaintiffs had been "uniquely positioned" to avail themselves of the "strongest cannabis growing environment in the United States, and had secured access to a supply of this raw material during the time when such material was scarce and restricted as to interstate shipment, making it a prime candidate to become an early player in the emerging hemp marker." *Id.* at ¶ 20.

"Following the legalization of hemp under the 2018 Farm Bill, prices of cannabinoids (hemp-derivatives) rose exponentially before sharply declining after 2019." Farmer Decl. ¶ 21. In 2018, the approximate market price for THC-free CBD Distillate was approximately $3,500 per kilogram, which fell to $2,500 per kilogram

in 2019 and, at the time of the Farmer Declaration ranged between $500 and $1,000 per kilogram. *Id.* at ¶ 22. Between 2019 and 2021, the approximate market price of THC-free CBD Distillate decreased by more than 60%. *Id.* at ¶ 65. Farmer affirms that Thar's failure to provide the Extractor in a timely manner and in working condition prevented Plaintiffs from taking advantage of the CBD prices in 2018 and 2019. *Id.* at ¶ 23.

This case was originally filed in Jackson County Circuit Court in June 2022 and was removed to this Court on July 22, 2022. ECF No. 1. This Court entered an order defaulting Thar on November 21, 2023, after Thar was unable to secure counsel to represent it following the withdrawal of Thar's prior attorneys. ECF No. 41.

## DISCUSSION

As noted, the Court considers motions for default judgment with reference to the seven *Eitel* factors. As a preliminary matter, this Court has jurisdiction over the case by virtue of diversity jurisdiction. *See* Notice of Removal ¶¶ 9-10 (demonstrating complete diversity). ECF No. 1. Thar also acknowledged that it was served with the action in the Notice of Removal. *Id.* at ¶ 2.

### I.  First *Eitel* Factor

The first *Eitel* factor considers whether the plaintiff would suffer prejudice if default judgment was not entered. *Eitel*, 782 F.2d at 1471; *PepsiCo, Inc. v. Cal. Security Cans*, 238 F. Supp.2d 1172, 1177 (C.D. Cal. 2002). Here, Thar has demonstrated an inability to litigate this case, and, in the absence of default

judgment, Plaintiffs would be unable to seek relief or redress for their claims. The Court concludes that the first factor weights in favor of default judgment.

## II.     Second and Third *Eitel* Factors

For the second and third *Eitel* factors, the Court weighs the merits of the substantive claims and the sufficiency of the operative complaint. *Eitel*, 782 F.2d at 1471-72. As part of this inquiry, the Court must consider whether the allegations in the complaint are sufficient to state a claim that supports the relief sought. *PepsiCo*, 238 F. Supp.2d at 1175. "These two factors are often analyzed together and require courts to consider whether a plaintiff has stated a claim on which it may recover." *Viet. Reform Party v. Viet Tan-Viet Reform Party*, 416 F. Supp.3d 948, 962 (N.D. Cal. 2019) (internal quotation marks and citations omitted, alternations normalized). "Of all the Eitel factors, courts often consider the second and third factors to be the most important." *Id*. (internal quotation marks and citations omitted).

Here, Plaintiffs bring claims for (1) breach of contract; (2) in the alternative, damages for price under the Uniform Commercial Code ("UCC"); (3) in the alternative for breach of warranty under the UCC; (4) unjust enrichment; (5) breach of the covenant of good faith and fair dealing; and (6) for declaratory relief.[1]

### A. Breach of Contract

To maintain a claim for breach of contract under Oregon law, a party must "allege the existence of a contract, its relevant terms, plaintiff's full performance and lack breach, and defendant's breach resulting in damage to plaintiff." *Slover v.*

---

[1] Plaintiffs do not seek default judgment on their claim for declaratory relief in their motion.

Page 9 –ORDER

*Oregon Bd. of Clinical Social Workers*, 144 Or. App. 565, 570 (1996) (internal quotation marks and citations omitted).

Here, Plaintiffs allege that the Agreement was a valid and enforceable contract; that Thar breached sections I and II of the Agreement by failing to deliver a functional supercritical fluid extractor conforming to the specifications in the Agreement; that Thar breached the Agreement's warranty in that the Extractor never functioned properly and was not free from material defects in workmanship; that Thar breached section III of the Agreement by failing to adequately provide the project management services outlined in the Agreement; that Plaintiffs have performed their obligations under the Agreement; and that Plaintiffs suffered damages as a result of the breach. Compl. ¶¶ 74-79, ECF No. 1-1.

Plaintiffs have provided a copy of the Agreement, ECF No. 28-2, which is consistent with the statements made in the Farmer Declaration, set forth in the previous section. The Farmer Declaration, ECF No. 42, also establishes that Thar breached the Agreement in the ways alleged in the Complaint in that the Extractor did not meet the design specifications set forth in the Agreement; Thar did not follow the start-up, installation, and project management procedures set forth in the Agreement; and Thar never provided Plaintiffs with a properly functioning supercritical fluid extractor as called for by the Agreement. Plaintiffs have established that they met their obligations under the Agreement and that Plaintiffs suffered damages, discussed in more detail below, as a result of Thar's breach. The

Court concludes that Plaintiffs' claim for breach of contract satisfies the second and third *Eitel* factors.

### B. Damages for Price

Plaintiffs second claim seeks damages under Oregon's adoption of the UCC, as this case involves a contract for the sale of goods. Pursuant to ORS 72.7110:

> Where the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods involved, and with respect to the whole if the breach goes to the while contract . . . the buyer may cancel and whether or not the buyer has done so may in addition to recovering so much of the purchase price as has been paid:
>
> (a) "Cover" and have damages under ORS 72.7120 as to all the goods affected whether or not they have been identified to the contract; or
>
> (b) Recover damages for nondelivery as provided in ORS 72.7130.

ORS 72.7110(1).

As relevant to Plaintiffs' claim, both ORS 72.7120 and ORS 72.7130 provide for the recovery of incidental and consequential damages under ORS 72.7150. ORS 72.7120(2) ("The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as defined in ORS 72.7150, but less expenses saved in consequence of the seller's breach."); ORS 72.7130(1) (providing "the measure of damages for nondelivery or repudiation is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in ORS 72.7150, but less expenses saved in consequence of the seller's breach."). Incidental damages "include

expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach." ORS 72.7150(1). Consequential damages are, in relevant part, "[a]ny loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise." ORS 72.7150(2)(a).

Here, Plaintiffs have pleaded in the Complaint that they properly rejected the non-conforming Extractor and that they incurred incidental and consequential damages as a result. Compl. ¶¶ 67-68, 83-84. These allegations are supported by the evidence and testimony provided by Plaintiffs. Farmer Decl. ¶¶ 63-64, 72. The Court concludes that this claim satisfies the requirements of the second and third *Eitel* factors.

### C. Breach of Warranty

Plaintiffs also bring a claim for breach of warranty under the Oregon adoption of the UCC. Under, ORS 72.7140, when a buyer has accepted goods and given notification of rejection under ORS 72.6070(3), "the buyer may recover damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in a manner which is reasonable." ORS 72.7140(1). Damages for breach of warranty are "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate

damages of a different amount," and "[i]n a proper case any incidental and consequential damages under ORS 72.7150 may also be recovered." ORS 72.7140(2), (3).

Here, Plaintiffs have alleged that the Agreement is a valid and enforceable contract and that Plaintiffs gave notice of rejection after acceptance of the non-conforming Extractor. Compl. ¶¶ 67-68, 86. Plaintiffs have also alleged that they have suffered damages, including incidental and compensatory damages, as a result of Thar's non-conforming tender. Compl. ¶ 89. These allegations are supported by testimony and evidence provided by Plaintiffs. Farmer Decl. ¶¶ 63-64, 72. The Court concludes that this claim satisfies the second and third *Eitel* factors.

### D. Unjust Enrichment

For claims of unjust enrichment, Oregon's Supreme Court utilizes a case-by-case analysis, replacing its previous formulaic approach. *Larisa's Home Care, LLC v. Nichols-Shields*, 362 Or. 115, 125-32 (2017). The Oregon Supreme Court has held that "Oregon courts should examine the established legal categories of unjust enrichment as reflected in Oregon case law and other authorities to determine whether any particular enrichment is unjust." *Id.* at 132. "In so ruling, Oregon's Supreme Court established that the Restatement (Third) of Restitution and Unjust Enrichment (2011) is the proper authority when considering whether unjust enrichment allegations fall within an established category." *BenefitElect, Inc. v. Strategic Benefit Solutions Corp.*, 614 F. Supp.3d 838, 845 (D. Or. 2022).

Page 13 –ORDER

Here, Plaintiff's Motion and Complaint present this claim under the old formula for unjust enrichment, which was rejected by the Oregon Supreme Court in *Larisa's Home Care*. *See* Pl. Mot. 5-6 (citing *Cumming v. Nipping*, 285 Or. App. 233, 238-39 (2017)).[2] As Plaintiffs have based this claim on the outdated elements, they do not present authority showing that their claim for unjust enrichment falls within an "established category," as required by *Larisa's Home Care*.[3] As such, the Court concludes that Plaintiff's claim for unjust enrichment falls short of meeting the standards of the second and third *Eitel* factors and the motion must be denied as to this claim. However, Plaintiff's present their claim for unjust enrichment in the alternative to their claim for breach of contract. Compl. ¶ 93. The Court has already determined that Plaintiffs are entitled to default judgment as to their claim for breach of contract and so the denial of default judgment as to this claim will not substantively alter the outcome of the motion or the computation of damages.

### E. Breach of the Duty of Good Faith and Fair Dealing

"Every contract contains an implied covenant of good faith and fair dealing," which "serves to protect the objectively reasonable contractual expectations of the parties." *Slover v. Oregon Bd. of Clinical Social Workers*, 144 Or. App. 565, 572 (1996); *see also* ORS 71.3040 ("Every contract or duty within the Uniform Commercial Code imposes an obligation of good faith in its performance and enforcement."). "Good

---

[2] In *Cumming v. Nipping*, 285 Or. App. 233, 238-39 (2017), the Oregon Court of Appeals cast doubt on the validity of the old formula, presaging the Oregon Supreme Court's subsequent decision in *Larisa's Home Care LLC v. Nichols-Shields*, 362 Or. 115 (2017), which was issued only a few months after *Cumming*.

[3] The conduct described in the Complaint would very likely fall within an established category of unjust enrichment, but in the absence of allegations and proof provided by Plaintiffs, the Court cannot supply the missing elements of the claim on a motion for default judgment.

faith" is "honesty in fact and the observance of reasonable commercial standards of fair dealing." ORS 71.2010(2)(t). "When a party engages in conduct that violates those expectations, it breaches the contract." *Slover*, 144 Or. App. at 572.

Here, Plaintiffs have alleged that the Agreement was a valid and enforceable contract between the parties and that it imposed a duty of good faith and fair dealing on Thar. Compl. ¶¶ 97-98. Plaintiffs allege that "Thar's improper design, construction, and installation of the Extractor led to expensive damage, in addition to exposing Plaintiffs to significant safety risks," as well as "Thar's inability to deliver a properly functioning Extractor in a timely manner, its failure to properly remedy the situation (including by sending hapless representatives who only added to the har,), and its deceitful conduct," establish a breach of the duty of good faith and fair dealing. *Id.* at ¶¶ 100-01. Plaintiffs allege that they suffered harm as a result. *Id.* at ¶ 102. These allegations are supported by the Farmer Declaration, at set forth in the previous section, and are also supported by the testimony of Mr. Farmer at the hearing. The Court concludes that this claim satisfies the second and third *Eitel* factors.

### III. Fourth *Eitel* Factor

Under the fourth *Eitel* factor, the Court "must consider the amount of money at stake in relation to the seriousness of Defendant's conduct." *PepsiCo*, 238 F. Supp.2d at 1176-77. "A large sum of money at stake would disfavor default judgment." *Durland v. Straub*, Case No. 3:20-cv-00031-IM, 2022 WL 2704169, at *6 (D. Or. July 12, 2022) (internal quotation marks and citation omitted). Here, the sum


of money involved is considerable, but it is commensurate with the seriousness of the claims against Thar. Weighed in the balance, the Court concludes that this factor will not preclude default judgment.

## IV. Fifth *Eitel* Factor

Under the fifth factor, the Court considers the possibility of dispute concerning material facts. "Because upon entry of default, all well-pleaded facts in the complaint are taken as true, the fifth factor weighs in favor of default judgment when the claims in the complaint are well-pleaded." *Durland*, 2022 WL 2704169 at *7 (internal quotation marks and citation omitted, alterations normalized). The Court concludes that the fifth *Eitel* factor weighs in favor of default judgment.

## V. Sixth *Eitel* Factor

"The sixth *Eitel* factor considers the possibility that the default resulted from excusable neglect." *PepsiCo*, 238 F. Supp.2d at 1177. Here, Thar appeared and initially defended in this action, but its attorneys withdrew, apparently due to Thar's lack of funds and Thar's entry into receivership. The Court concludes that this factor weighs in favor of default judgment.

## VI. Seventh *Eitel* Factor

Finally, *Eitel* counsels that cases "should be decided upon their merits whenever reasonably possible." *Eitel*, 782 F.2d at 1472. However, "this preference, standing alone, is not dispositive," and "does not preclude a court from granting default judgment." *PepsiCo*, 238 F. Supp.2d at 1177 (internal quotation marks and

citation omitted). The presence of this factor, which generally weighs against default judgment, will not prevent entry of default judgment in favor of Plaintiffs.

## VII. Damages

"It is well settled that a default judgment for money may not be entered without a hearing unless the amount claims is a liquidated sum or capable of mathematical calculation." *Davis v. Fendler*, 650 F.2d 1154, 1161 (9th Cir. 1981). Here, the Court held an evidentiary hearing on December 5, 2023, at which Plaintiff Dale Farmer testified under oath as to damages. The Court finds that Mr. Farmer's testimony was credible and consistent with his declarations. Plaintiffs have presented evidence in favor of their requested damages of $6,900,000.

Plaintiffs affirm that, had Thar provided the Extractor as agreed, Plaintiffs would have produced 12,500 liters of CBD oil with a market value of $500 per liter for a gross income of $6,250,000, against expenses of $1,875,000 for a net profit of $4,375,000. Farmer Decl. ¶ 72. In addition, Plaintiffs would have toll processed 250,000 pounds of industrial hemp at a rate of $10 per pound for a gross income of $2,500,000. *Id.* Offset by expenses of $300,000, Plaintiffs would have generated a profit of $2,200,000 from toll processing. *Id.* Instead, Plaintiffs have produced only 2,375 liters of CBD oil for a gross income of $296,875 and have realized no net profit. *Id.* In addition, the poor condition and workmanship of the Extractor, outlined above, has caused Plaintiffs to incur expenses totaling $125,000 for the diagnosis and repair of the Extractor. *Id.* Following repairs, Plaintiffs affirm that the fair market value of the Extractor is only $1,000,000, or less than half of the $2,400,000 market value

of the Extractor, had it been delivered as contracted. *Id.* Plaintiffs calculate their damages as follows:

- Lost profits for production of CBD oil: $4,375,000
- Lost profits on toll processing of hemp: $2,200,000
- Expenses incurred in attempting to diagnose and repair the Extractor: $125,000
- The reduction in value of the Extractor: $1,400,000

These damages are offset by the withheld portion of the purchase price of the Extractor, which was $1,200,000. In total, the testimony and other evidence demonstrate that Plaintiffs' damages amount to $6,900,000. Plaintiffs are also entitled, under ORS 82.010 to pre- and post-judgment interest at a rate of 9% per annum.

The sum of $6,900,000 shall be awarded, together with pre-judgment interest of 9% per annum from September 1, 2018, through the date of the judgment and post-judgment interest at 9% per annum from the date of the judgment until paid in full.

## CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for Default Judgment, ECF No. 42, is GRANTED in part and DENIED in part. The Motion is denied as to Plaintiffs' claim for unjust enrichment but granted as to all other claims. All counterclaims are dismissed. Plaintiffs are awarded damages in the amount of $6,900,000 together with prejudgment interest at 9% per annum from September 1, 2018, through the date of the judgment and at 9% per annum from the date of the judgment on the amount thereto until paid in full. Final judgment shall be entered accordingly.

It is so ORDERED and DATED this ___6th___ day of December 2023.

/s/Ann Aiken
ANN AIKEN
United States District Judge